# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James B. Zagel | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 5097 | **DATE** | 4/16/2003 |
| **CASE TITLE** | JALAL HMADIAN, ET AL. vs. JOHN ASHCROFT, ET AL | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

---

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
  ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **Defendant's motion to dismiss is granted. The petition for a writ of habeas corpus is denied.**

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | | Document Number |
|---|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | | |
| | No notices required. | | number of notices | | | |
| | Notices mailed by judge's staff. | | | | | |
| | Notified counsel by telephone. | | APR 2 9 2003 | | | 31 |
| ✓ | Docketing to mail notices. | | date docketed | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | | | |
| | Copy to judge/magistrate judge. | | | | | |
| DW | | courtroom deputy's initials | U.S. DISTRICT COURT | date mailed notice | | |
| | | | | Date/time received in central Clerk's Office | mailing deputy initials | |

JALAL HMAIDAN, MOHAMMED
AIDOUNI, MAITHAN ALZEHRANI,
KEOVONGSACK
PONGPHRACHANXAY, and DEN SON,

    Petitioners,

    v.

JOHN ASHCROFT, Attorney General,
BRIAN R. PERRYMAN, as District
Director of the Immigration & Naturalization
Service, IMMIGRATION &
NATURALIZATION SERVICE, UNITED
STATES DEPARTMENT OF JUSTICE,

    Respondents.

No. 02 C 5097
Judge James B. Zagel

APR 1 8 2003

## MEMORANDUM OPINION AND ORDER

    A group of alien persons in the custody of the Immigration and Naturalization Service seek the writ of habeas corpus on behalf of themselves and on behalf of a class of similarly situated persons. The claim here is not that the INS is acting outside the scope of its regulations; rather, the regulations themselves are attacked as violating the due process clause of our Constitution on their face and as applied. Also, it is contended that the rules and regulations are arbitrary, capricious and outside the ambit of the law, and so stand in conflict with the Administrative Procedures Act ("APA").

    The petitioners have all been ordered removed from this country, but the INS is unable to remove them to their countries of origin. In *Zadvydas v. Davis*, 533 U.S. 678 (2001), the Supreme Court said a six-month period of detention was presumptively reasonable. All the petitioners are detained for more than six months. *Zadvydas* also said that indefinite detention

where there is no reasonable likelihood of removing them from the country is beyond the statutory power of the INS or the Attorney General. The Court said:

> "[I]nterpreting the statute to avoid a serious constitutional threat, we conclude that once removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute....[In habeas cases the] court must ask whether the detention in question exceeds a period reasonably necessary to secure removal. It should measure reasonableness primarily in terms of the statute's basic purpose, name assuring the alien's presence at the moment of removal. Thus, if removal is not reasonably foreseeable, the court should hold continued detention unreasonable and no longer authorized by statute. In that case, of course, the alien's release may and should be conditioned on any of the various forms of supervised release that are appropriate in the circumstances, and the alien may no doubt be returned to custody upon a violation of those conditions...And if removal is reasonably foreseeable, the habeas court should consider the risk of the alien's committing further crimes as a factor potentially justifying confinement within that reasonable removal period."

533 U.S. at 699-700. It is fair to say that the Attorney General was dismayed by the decision of the Supreme Court, which had resolved a split among the Court of Appeals. He expressed concerns for public safety because the detainees are those who have been convicted of crimes in this country.[1]

---

[1]One could argue that the practice required by *Zadvydas* is perverse. If an alien is likely to be removed, one can consider the fact that he or she is a repeat offender in deciding to confine an habitual thief until removal. If the alien won't be removed, then he or she has to be released no matter how likely to offend, as long as that alien is likely to show up if his or her native country eventually decides to let the wanderer return. Yet the law has many such provisions—a

2

In response to the decision of the Supreme Court, petitioners say the Executive Branch adopted procedures which forfend the release of those whom it has no authority to detain by delaying the decision to release. The decision is made by a "faceless bureaucracy," deadlines are not set, hearings are not provided, impartial review is absent and decisions are not administratively appealable.

The standard for release is that the detainee must show (I simplify here) that he or she is unlikely to be removed in the foreseeable future, and also that he or she is a "non-violent" person. The District Office makes a yes or no determination. If the answer is no, the alien may have the Headquarters Post-order Detention Unit consider these questions again. It has no deadline, and petitioners allege that it rarely decides until six months of detention has passed. There is no evidentiary hearing. In cases where the inability to remove is conceded by INS, but no other cases, the decision to detain may be presented to an Immigration Judge, subject to review by the Board of Immigration Appeals. Where the decision by the INS is based on the finding that there is still a possibility of removal, or that the detainee has not cooperated in securing his own return (for example, by refusing to provide information which would allow the country of origin to determine that the detainee is their citizen or subject), then that is the end of the matter.

---

patent repeat offender citizen felon has to be released when his sentence is completed no matter what harm is likely to ensue. Essentially, this is the kind of argument made by petitioners who, wisely, do not attempt to glorify the petitioners as ornaments to this nation. Their position is quite akin to saying "regardless of whether the convict will certainly con widows out of their life savings, the sentence is expired and the cell doors have to be opened." I note too that these petitioners (and the putative class) do not include those whose detention is said to be justified under regulations which permit detention for aliens who have highly contagious diseases, who are "especially dangerous," whose release would have serious adverse foreign policy consequences or whose release would create risks of terrorism or breach national security.

3

This system is alleged in practice to compound problems. Detainees are not given adequate notice required by regulations, file review dates are misstated and failure to cooperate disqualifies persons for release even when the country of origin is one for which it is impossible to obtain travel documents. A class action is said to be justified by the high proportion of indigent detainees whose individual petitions for a writ cannot be effectively prosecuted, and there is no formal administrative review which a pro se detainee can exhaust which might give timely relief. Judging solely by the docket in this Court, the class would be numerous.

## I.

## The Petitioners

The individual petitioners were and are:

1. A stateless Palestinian, Jalal Hmaidan, born in Kuwait and holding a Jordanian passport, but now said to be a subject of neither nation. He has been living here as a lawful resident for over 25 years and has family here. He was convicted of aggravated discharge of a firearm and possession of a controlled substance with intent to deliver. He received multiple year sentences for both offenses. He has ten arrests and five convictions. Preferring Jordan or Kuwait to jail, he says he has tried to get travel documents, but the INS says he never identified himself as a stateless person, but rather, as a Jordanian. From the INS's perspective, he did a slapdash job of filling out the Jordanian request form for travel documents and little else. In any event, the INS was apparently right about his removal, because he now has papers to go to Jordan, and he is dismissed from the case.

2. An Algerian, Mohammed Aidouni, who came here as a stowaway and remained illegally. He was convicted of robbery and weapons charges and detained for a period of years,

in part because of the time it took to adjudicate his unsuccessful attempt to avoid return to Algeria under the Convention Against Torture. While Algeria is not readily issuing travel documents these days, the INS says he failed to tell an Algerian official that he had a mother and three brothers living in Algeria (at least initially), and said he had no family in that country. The INS says that he has not cooperated to secure his removal.

3. An Iraqi, Maithan Alzehrani, who entered this country in 1993 as a refugee fearing persecution. He became a Lawful Permanent Resident. He was convicted in 1997 for unlawful restraint and domestic battery and again in 1998 for criminal sexual assault. He was the subject of an explicit decision to detain him on grounds that he had no plan on where to live or how to support himself, he had displayed an escalating pattern of violence, and he failed to demonstrate he is no longer a threat to society. Iraq is, and has been for a while, a very difficult country to which to remove a detainee, so the INS granted release on bond conditioned on his being in a sexual offender treatment program and living with a family member or friend in Chicago. The INS has now removed the bond requirement, and he too is effectively gone from this case.

4. A Laotian, Keovongsack Pongphrachanxay, who entered from a refugee camp in Thailand in 1981. By 1997, he had acquired one conviction for Armed Robbery and another for Robbery and sentences of multiple years duration. Laos does not accept deportees. He has been offered release, but only upon posting a $20,000 bond, which he cannot do. The power of the government to require a bond is denied by petitioner.

5. A Vietnamese, Den Son, who is Amerasian by ethnicity who entered this country in 1991 to look for his father whom he believes to have been a soldier in Vietnam. Less than a year after his entry, he was convicted of Home Invasion and served a good part of his twenty years in

5

the U.S. in prison. The INS has had him since mid-2001. He cannot be returned to Vietnam, and he too was given release upon the posting of a bond of $25,000.

The respondents say that the conclusions of the INS are valid under regulations which are consistent with the law.

After *Zadvydas*, the Attorney General issued regulations which, triggered by the end of the six-month period, allow the detainee to petition the INS for release on the ground that there is no significant likelihood of repatriation. The detainee has to show this, usually by documentation, and he or she also must show that he or she has cooperated in the process of obtaining travel documents. According to *Zadvydas*, "once the alien provides good reason to believe that there is no significant likelihood of removal in the foreseeable future, the Government must respond with evidence sufficient to rebut that showing." 533 U.S. at 701.

Turning to the individual cases, I consider the standard of review for overturning the determinations made by the INS. There is one deferential test which approves "facially legitimate and bona fide" bases for decision. *Fiallo v. Bell*, 430 U.S. 787 (1977). Another less deferential test is "abuse of discretion." *INS v. Jong Ha Wang*, 450 U.S. 139 (1981). The context of both of these decisions leads me to doubt that the *Zadvydas* Court had either in mind. A third standard is whether the decision is supported by substantial evidence (sometimes thought of as a kind of directed verdict standard in which the judgment stands unless no reasonable fact-finder would have reached that judgment). *INS v. Elias-Zacarias*, 502 U.S. 478 (1992). Reading what can be no more than runes in *Zadvydas*,[2] I think this last standard applies if one substitutes

---

[2] *Zadvydas* said, "We recognize, as the Government points out, that review must take appropriate account of the greater immigration-related expertise of the Executive Branch, of the serious administrative needs and concerns inherent in the necessarily extensive INS efforts to enforce this complex statute and the Nation's need to 'speak with one voice' in immigration

the phrase "reasonable person possessing immigration-related expertise" for "reasonable fact-finder."

The INS says that Aidouni did not cooperate with the Algerian counselor official who interviewed him. All he would provide is his name and the name of his attorney which, if true (and it is not denied), would make it difficult for Algeria to verify his identity and approve his repatriation, which became an issue in October 2001, when the removal order became final. INS has undertaken its own efforts at repatriation by asking this nation's embassy in Algiers to assist in establishing Aidouni's identity. Aidouni correctly notes that the Algerian counselor's interview took place after the filing of his petition here and well after the six-month period of presumptively reasonable detention passed. It is difficult to infer unwillingness to cooperate when a detainee, who has filed a petition over repatriation and is represented by counsel, tells anyone to talk to his lawyer about repatriation. Some of the information he could provide was in the INS files since they wrote to his mother in Algeria in 1999, and immigration hearing transcripts indicated that he had three brothers in Algeria and this is, in fact, part of the material that the Embassy in Algeria is using to help get Aidouni into Algeria. The other part was provided by Aidouni's attorney in October 2002, which is the current whereabouts of his mother

---

matters...But we believe that courts can take appropriate account of such matters without abdicating their legal responsibility to review the lawfulness of an alien's continued detention." 533 U.S. at 700. I call these words "runes" because they can be interpreted to mean that taking "appropriate account" refers to a generalized deference to the determination that detention may be important as a matter of policy–and not any deference to the decision in any particular case. Support for the idea that no deference is owed to any particular decision is found in other language, e.g "the habeas court must ask whether the detention...exceeds a period reasonably necessary...[i]t should measure reasonableness...the habeas court should consider the risk..." 533 U.S. at 699-700. Looking at the structure of the opinion, my best guess is that taking account of expertise means that decisions about individuals are entitled to some deference.

and the name of his brother. What is left for the INS, argues Aidouni, is that Algeria has not actually said they will not take him, and this is not enough.

I do not agree that this is all that is left for Aidouni. On the facts before the INS and me, there is evidence which could lead a reasonable fact finder to believe that (1) Aidouni has a far greater desire to remain here undetained than he does to return to Algeria; (2) his actions show that he is not cooperating as fully as he could to procure his repatriation; and (3) the lack of such cooperation is significant. And, in turn, the INS is making significant efforts to assist his repatriation, and nothing in the response of Algeria supports the conclusion today that his repatriation is not in the reasonably foreseeable future.

A court can consider ongoing efforts by INS or others to repatriate an individual in reviewing the question of whether removal is likely in the reasonably foreseeable future. *Khan v. Fasano*, 194 F. Supp.2d 1134, 1135 (S.D. Cal. 2001). There is no evidence here or before the INS that shows that such efforts will be futile. Were it shown that Algeria has steadfastly refused travel documents in all, or almost all, cases, which might be known to the INS, but not referred to in the record before me, the outcome might be different. I agree that efforts to repatriate Aidouni could have been more vigorous and seem only to have become more vigorous after he filed the petition. And I must bear in mind that "as the period of prior post-removal confinement grows, what counts as the 'reasonably foreseeable future' conversely would have to shrink." *Zadvydas* 533 U.S. at 701. But I am unable to conclude that respondents could not decide, on these facts, that there is a significant likelihood of removal in the reasonably foreseeable future. Were a new petition filed just a bit later, with some additional data on removals to Algeria, the result here or before the INS might be different.

8

Applying a standard of review to the record is not what is needed to resolve the disputes involving Pongphrachanxay and Den Son. They assert that a bond requirement is beyond the authority of the INS, and they do argue that petitioners are clearly the kinds of individual for whom a lawfully authorized bond could never reasonably be required. They also assert that the INS, if it has the power to require bond, lacks the power to require a bond of the sort it did in these cases. The regulation authorizes the requirement to post a bond. 8 C.F.R. §241.5 (b) (2002). *Zadvydas* seems quite clearly to permit the imposition of supervision with conditions, but says nothing about whether posting a bond is an appropriate condition. And there is some reason to think that bonds are not what the Court had in mind because it spoke of the power of the Government to "incarcerate [those under removal orders]...for violations of those conditions." 533 U.S. at 695. Posting a money bond is, for the most part, a pre-condition to release and not a command to do or not do something in the future which, if not obeyed, may result in jailing.

The statute in question, 6 U.S.C. §1231(a)(3), does not contain an explicit authorization of a money bond. It simply says that aliens like petitioners shall be subject to supervision under regulations prescribed by the Attorney General, and then it mandates that three specific provisions (none of which mention money bonds) for these regulations and adds a kind of "catch-all" which requires the alien "to obey reasonable written restrictions on the alien's conduct or activities that the Attorney General prescribes for the alien."

The Attorney General is entitled to deference in his interpretation of the statute, particularly where the interpretation fills a gap in the statute. *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837 (1984). It is true that there are provisions for money bonds scattered throughout the statutes governing aliens, but it is too hard for me to read the

9

statutory provision here as manifesting a deliberate exclusion of money bonds. It is almost always true, and it is true here, that catch-all provisions are implicit recognitions that gaps have been left and are explicit grants of authority to fill those gaps. Yet, the explicit authority extends to "restrictions on...conduct," a phrase that does not easily cover the posting of money bonds. Nevertheless, posting a money bond is a "conduct or activit[y]" within the lexical ambit of the statute, and I do not think the Attorney General exceeded his lawful reach in interpreting the statute, his interpretation being reasonable and plainly, neither arbitrary nor capricious.[3]

The setting of the bonds in these cases is said to be the functional equivalent of authorizing indefinite detention. Technically, the bonds have a one-year duration, but that limitation takes effect only if the money is posted. Bonds in criminal cases often are the functional equivalent of detention too, but in the criminal case, pre-trial detention ends (one way or the other) after trial which the defendant has a right to demand and receive within a fairly short time. Here, there is no way for the detainee to take any action which will finally resolve the question of his custody. He simply has to wait until the day, if that day ever comes, that another nation decides to accept him or her. For this reason, I agree it is inconsistent with *Zadvydas* to hold that the INS has the power to set a bond that the detainee is unable to post.[4]

The position of the INS is that neither petitioner can challenge the amount of the bond at this time because they have not proven that they cannot post the bond, to wit, there is no evidence

---

[3]I am not presented here with the more difficult question of the requirement that one who will never be repatriated must post a money bond which then stands for the rest of his or her life. It is not presented on the facts of this case because the bonds are remitted after twelve months of compliance with conditions.

[4]I do not know whether it would be unconstitutional for Congress to confer precisely this power upon the Executive Branch, although *Zadvydas* suggests that it might be. 533 U.S. at 690. I have no reason to decide that question here.

of indigence or of efforts to raise the money from others. This, despite the fact that the INS told them they could assert inability to post bond and submit financial documents in support of this. It has also told them that compliance with conditions of supervision for one year will result in the return of the bond money. Essentially, the petitioners have not taken the opportunity given them to show inability to post the bond and therefore, have failed to exhaust administrative remedies which is usually required in habeas cases filed by aliens in the custody of the INS. *Arias v. Rogers*, 676 F.2d 1139 (7th Cir. 1982). The exhaustion requirement, which does not appear in the statute, is a judicial graft, the sound purpose of which is to allow the consideration of habeas relief on a more developed factual record without burdening the habeas court with the task of presiding over the development of that record.

The petitioners question whether there is an administrative remedy to exhaust and, if there is one, they say it is one recently rigged up in reaction to judicial challenges to the setting of bonds. I accept the representation of the Attorney General that there is an administrative remedy. I also agree with petitioners that it has been hastily devised to meet the challenges of cases like this, but I do not think the petitioners are excused from using it. The national perspective on control of aliens within our borders was profoundly altered in recent months, and the legal landscape changed too with *Zadvydas*. It is not an indicia of bad-faith that the Attorney General has had to scramble to meet legal and policy requirements that neither he nor his predecessors had anticipated. In another context, the claim of an adequate administrative remedy made here would be unconvincing. In this context, it is not. Under *Zadvydas*, however, the administrative determination of the reasonableness of the amount of bond must, in the circumstances here, be made quite quickly. A court faced with such a question can usually decide the matter within a week or two.

## II.

### The Class

A purported class action is part of the petition before me. No motion for class certification has been filed, but the government seeks to have the petition dismissed. Today denial of certification would occur for the very reason that petitioners, having no present right to the writ themselves, are inadequate class representatives.

The class action habeas corpus is a rare thing. Apart from the obvious reason that habeas determinations are quintessentially individual in nature, there is the fact that class habeas cases, running as they do against governments, are always vulnerable to the ability of the plaintiff to moot the case of every class representative by releasing them. This is in contrast to a small stakes consumer fraud case where a representative plaintiff can always refuse settlement. What the petitioners (perhaps more precisely, their attorneys) want is the chance to have a court declare that the INS must comply, regularly, with the time limits embodied in *Zadvydas*, and they suspect that doing these cases one at a time will not work.

There may be other barriers as well to class certification, but I cross those bridges when I come to them.

I do not dismiss on the grounds that no claim has been stated. While the individual petitioners here fall short of being able to press their claims today, the allegations of undue delay and inadequate hearing procedures do present due process claims. Jurisdiction is claimed to lie under the APA. This is a dicey claim in light of *Ardestani v. INS*, 502 U.S. 129 (1991), and *Lalani v. Perryman*, 105 F.3d 334 (7th Cir. 1997). One could argue that these post-removal order operations are not deportation or removal proceedings and thus, outside the exemption from the APA which Congress gave to the INS, but one could argue that they are.

12

At this stage, and on the issues as briefed,[5] I decline to dismiss Counts Six through Ten. Upon a request by the defendants, I will enter a scheduling order under Fed. R. Civ. Proc. 16, which will set a deadline for the filing of a motion for class relief.

I dismiss Counts One and Three for mootness. I decline to issue the writ on Counts Two, Four and Five. I deny the motion to dismiss Counts Six through Ten.

ENTER:

James B. Zagel
United States District Judge

DATE: 16 April 2003

---

[5]Briefing by both sides was, correctly, conducted on the premise that the individual claims would or might survive. That premise may no longer be valid and the parties may wish to recast their arguments. Moreover, the three petitioners whose claims are denied may, fairly soon or even now, find themselves in a position where the barriers to their claims no longer exist. Both petitioners and respondents are entitled to a chance to determine from their own perspectives what they ought to do now because, while these petitioners may or may not leave this legal scene, the issues will not.