VADIM KAZAROV, on behalf of himself
and all others similarly situated,

     Petitioner,

        v.

DEBORAH ACHIM, Field Operations
Director, Chicago District, Immigration and
Customs Enforcement, Department of
Homeland Security,

     Respondent.

No. 02 C 5097
Judge James B. Zagel

## MEMORANDUM OPINION AND ORDER

### Findings of Fact

1.     This action was originally filed on July 18, 2002 when the Midwest Immigration and Human Rights Center filed its "Class Action for Writ of Habeas Corpus and Complaint for Declaratory and Injunctive Relief."

2.     Members of this class consist of aliens in the Chicago District who have been detained for over six months after a final order of deportation.

3.     By statute, aliens who are convicted of certain crimes must be deported,[1] and regulations require the government to take those aliens into custody pending removal.[2]

4.     The Bureau of Immigration and Customs Enforcement ("ICE") has the responsibility to apprehend, detain and remove aliens under a final order of removal. ICE is a division within the Department of Homeland Security.

---

[1] 8 U.S.C.A. § 1226 (2005).

[2] 8 C.F.R. § 241.3 (2005).

5.      Statute authorizes the Attorney General to detain in custody beyond the ninety day removal period those aliens considered a flight risk or a threat to the community.[3] ICE is divided into several "Field Office" districts. Chicago is one of the Field Offices, and the Chicago Field Office Director has responsibility for ICE activities in several states. For the past two years the Chicago Field Office Director has been Deborah Achim.

6.      Once an alien becomes subject to a final removal order, and has exhausted all appeals and stays, the vast majority of aliens are deported within ninety days of the final order. While the Chicago Field Office—with jurisdiction over several states—takes approximately 700 to 800 aliens into custody every month, only 40 to 50 of those cases reach the 90-day review.

7.      Within the Chicago Field Office, three levels of administration exist under the Field Office Director with respect to detention and removal activity following a final order of removal. These three levels comprise the Post Order Custody Review unit ("POCR unit").

8.      At the lowest level within the Chicago POCR unit are two or three Deportation Officers. Next in the chain of command is the Supervising POCR Detention Officer. Above that official is the Deputy Chicago Field Office Director, and then comes the Chicago Field Office Director.

9.      The POCR Deportation Officers have the responsibility to maintain the file (called the "A-File") for each alien in the process of removal, to obtain travel documents for the alien, to communicate with the alien, and sometimes even to escort the alien to the country to which the alien is being removed.

---

[3] 8 U.S.C.A. § 1231(a)(6) (2005); 8 C.F.R. § 241.4 (2005).

10.     Deportable Alien Control System ("DACS") is the name of the computer software system used by the Chicago Field Office to keep track of alien information.

11.     The term "travel document" includes a passport or some other piece of paper that will allow the alien to enter the country to which he is being deported.

12.     If an alien does not have a travel document, the Chicago POCR unit will communicate with the embassy of the country to which the alien is to be deported in order to obtain a travel document.

13.     An alien is required to assist and cooperate in the effort to obtain a travel document.[4]

14.     ICE has difficulties obtaining travel documents from some countries, and ICE encounters delays from other countries. Individual detainees may also encounter difficulties simply because a country may claim (truthfully or not) that inadequate information exists to establish that the alien is a citizen of that country.

15.     The purpose of the POCR Review is to determine whether the alien should be released under supervision or continued in detention. If the alien is released, the alien continues to be subject to removal and ICE will continue in its efforts to obtain travel documents.[5]

16.     At approximately forty-five days after a Final Order, the Deportation Officers send an alien in custody three documents. All are "form" documents:

---

[4] 8 C.F.R. § 241.4(g)(5) (2005).

[5] 8 C.F.R. § 241.4 (2005).

(1) A Notice To Alien of File Custody Review;
(2) Instruction Sheet to Detainee Regarding Requirement to Assist in Removal;
(3) Warning for Failure to Depart.

17.     The Notice To Alien of File Custody Review invites the alien to communicate with the Deportation Officer on any of ten subjects, but those subjects do not include, explicitly, the likelihood of obtaining travel documents in the reasonably foreseeable future. The Notice form does not inform the alien of the nature or status of Deportation Officer efforts to obtain travel documents.

18.     At approximately ninety days from the Order of Final Removal, the Deportation Officer completes a POCR worksheet. The POCR worksheet is a form that contains basic information about the alien. The Deportation Officer completes the form using information from the alien's A-File.

19.     The POCR worksheet does contain a block of space for the Deportation Officer to fill in the history of the effort to obtain travel documents.

20.     The POCR worksheet also contains a block of space for the Deportation Officer to check a box for a "Custody Recommendation." There are three boxes to select from:

(1) "Release from Custody / Order of Supervision;"
(2) "Continue in Custody / Retain Custody Jurisdiction;"
(3) "Continue in Custody / Refer to [Headquarters Post-Order Detention Unit]"

21.     Although the POCR Worksheet, Regulations, and Field Office Manual give ICE officials discretion to interview aliens in custody during the Post Order Custody Review process,[6] the Supervising Deportation Officer of the Chicago Field Office testified that aliens in custody

---

[6] 8 C.F.R. § 241.4(h)(i) (2005);

are not interviewed very often, and he did not know of any interviews within the last year. The Supervisor of the Headquarters Post-Order Detention Unit ("HQPDU") unit testified that he did not think an alien in custody could send anything useful that was not already in the file, and that interviews seldom occurred.

22. The Deportation Officer also prepares either a "Release Notification" or "Decision to Continue Detention" form letter for signature by the Chicago Field Office Director.

23. HQPDU had issued a "Step-By-Step Checklist" to field office Deportation Officers that instructed Deportation Officers to deny release at the 90 day POCR review based upon "danger to the community and flight risk," and not to give "availability of a travel document as a reason for continued detention." Moreover, the memorandum directed the Headquarters Deportation Officers to include "negative history" in the decision to continue the alien in detention in order to show the court that the alien was a "bad person," even though that information may be irrelevant under current precedent.

24. The Deportation Officer sends the POCR worksheet, the A-File, and either the Release or Continued Detention form letter to the Chicago Supervising Deportation Officer for review. If the Supervising Deportation Officer agrees with the recommendation of the Deportation Officer, the Supervising Deportation Officer signs the POCR worksheet, and passes it and the rest of the file to the Chicago Field Office Director or Deputy Director, who makes the final decision whether to continue detention of the alien.

25. The current Chicago Field Office Director receives the POCR worksheet and either a completed "continued detention" or "release" letter for her signature. The Field Office Director signs (or refuses to sign) the letter submitted to her, and then that letter is sent to the

alien. Deportation Officer Ahmad of the Chicago Field Office testified that no supervisor had ever disagreed with her recommendation to release an alien or to continue an alien in custody.

26. The Decision To Continue Detention letter is a "form," but it contains spaces for the date, the detainee's name, "Detention Location Address," and a line for the signature of the Field Office Director. The form letter also contains two "instructions" for the Field Office Director:

> (1) "Add case history, criminal history summary and specific reasons for continued detention pursuant to 8 CFR 241.4 (threat/flight risk)."
> (2) "To be served after the 90-day POCR Review in the case of an alien whose removal will be affected in the foreseeable future . . .."

The same form letter also informs the alien:

> If you have not been released or removed from the United States by *[Add Date of Day 180]*, jurisdiction of the custody decision in your case will be transferred to Headquarters Post Order Unit (HQPDU) . . . HQPDU will make a final determination regarding your custody.

27. The Decision to Continue Detention form letter is intended to tell the alien why the agency decided the alien should be detained. Since that is its sole purpose, it does not inform the alien of collateral, but important, issues, to wit, the status of the government's efforts to obtain travel documents or what response, if any, the government has received from the country to which the government wants to remove the alien. Nor does the form letter advise the alien that, after 180 days from the date of a final order of removal, the government has the burden of producing evidence to rebut an alien's proffered reasons to believe that there is no significant likelihood of removal in the reasonably foreseeable future.

28. Between 90 and 180 days from the date of a final order of removal, the Chicago Post Order Custody Review Unit does not conduct another formal POCR evaluation, or prepare a new Post Order Custody Review Worksheet.

29. At or about the 180th day, the Chicago Field Office Director has a final opportunity to order an alien released before jurisdiction over custody determination automatically passes to HQPDU (now HQCDU) in Washington, D.C.[7]

30. During the final review at the Chicago Office, just before the 180 days from the date of the final order of removal, the Chicago Field Office does not notify the alien that the Chicago Field Office is about to make a final custody review before custody decision jurisdiction transfers to HQPDU.

31. Only HQPDU can release an alien because of a determination that no significant likelihood exists that an alien will be released in the reasonably foreseeable future.[8]

32. After 180 days from a Final Order of Removal, the Chicago Field Office does not have to make another formal review of the alien's file for one year.

33. At the 181st day, when jurisdiction over custody decisions transfers to HQPDU, the Chicago Field Office transfers the POCR review sheet and a cover memorandum to HQPDU. Although the POCR worksheet is transferred to HQPDU, the A-File remains in the Chicago Field Office.

---

[7] 8 C.F.R. §§ 241.4(c)(2); 241.4(k)(l)(ii); 241.4(k)(z)(ii) (2005).

[8] 8 C.F.R. §§ 241.4(i)(7); 241.4(k)(l)(ii) (2005).

7

34.     At HQPDU, the custody determination comes under the Office of Detention and Removal Operations, and the custody determination is made by the supervisor of Detention and Removal Operations, based upon a recommendation of a HQPDU Deportation Officer.

35.     HQPDU strives to issue a custody decision within 30 days of receiving the POCR worksheet. Absent the "special circumstances" contained in 8 C.F.R. § 241.14, the decision to release or retain an alien in custody after 180 days depends solely upon whether a significant likelihood exists that removal can be accomplished in the reasonably foreseeable future.[9]

36.     If HQPDU has assumed jurisdiction over an alien's file, the Chicago Field Office Deportation Officer only notifies "Headquarters" if the Deportation Officer knows or believes that a travel document will or will not be forthcoming. If a travel document is pending, the Deportation Officer does not notify Headquarters.

37.     The Chicago Field Office Deportation Officer "[retains] responsibility of docket control, case management, completion of future reviews, and will continue appropriate follow-up efforts to remove the alien."

38.     Furthermore, "The HQPDU shall consider all the facts of the case including but not limited to, the . . . history of the [ICE's] efforts to remove aliens to the country in question . . . including the ongoing nature of the [ICE's] efforts to remove the alien . . . [and] the reasonably foreseeable results of those efforts...."[10]

39.     A Deportation Officer at HQPDU considers the POCR Review Sheet, communicates with the Chicago Field Office Deportation Officers as necessary, and prepares a

---

[9] 8 C.F.R. § 241.14 (2005).

[10] 8 C.F.R. § 241.13(f) (2005).

8

recommendation to the Supervisor of the Detention and Deportation Unit that a "180 days plus" alien be released or continued in detention. The Supervisor rarely disagrees with the recommendation of the Deportation Officer, and the present Headquarters Supervisor could not remember it ever happening.

40.     The regulations require that HQPDU issue a "written decision based on the administrative record . . . regarding the likelihood of removal and whether there is a significant likelihood that the alien will be removed in the reasonably foreseeable future under the circumstances."[11]

41.     In the third quarter of 2004, HQPDU imposed a monthly reporting requirement on the Field Offices, including the Chicago Field Office, on the status of the "180-day plus" cases. The report requires updates on, among other things: 1) the date travel documents were requested; 2) the date of the last follow-up on travel documents; 3) the date of the last POCR review and the decision; and 4) "current case status/comments." Although the Chicago Field Office has received ratings of "no deficiencies," the Chicago Field Office Director did not know precisely what would constitute a deficiency. The reviews initiated by HQPDU in the fall of 2004 involved a sampling of Field Office cases. For instance, 0-90 day cases are checked to see if travel documents have been requested and the notices issued to the alien; 90-180 day cases are checked to verify that a 90-day POCR decision was issued and the decision letter delivered; and "180 days plus" cases are checked to verify that the case was sent to Headquarters and that there were periodic follow-ups on travel documents.

---

[11] 8 C.F.R. § 241.13(g) (2005).

42.     The HQPDU instituted a monthly "report" from all Field Offices regarding the status of all "180 day plus" cases. The supervisor of HQPDU testified 1) there are no set dates for HQPDU reviews; 2) there are no records kept to show how quickly "180 day reviews" are made; 3) there is no time limit after HQPDU has made a "decision to detain" within which the next review must occur; and 4) there are no records of what the average length of a "180 day review" is.

43.     HQPDU relies upon the Chicago Field Office to send memoranda that trigger new custody reviews. Headquarters only follows up on the "comments" if "need be." In the absence of a request for review by an alien, the regulations only require an annual review following a decision by HQPDU to continue detention.[12]

44.     The HQPDU Supervisor testified that once a "continued detention" letter is issued at the initial "180 day plus" review, there is no time limit for the next review.

45.     The regulations, like most judicial opinions and executive regulations, do not define the terms "significant likelihood" or "reasonably foreseeable future," except where the regulations state, "where the [ICE] is continuing its efforts to remove the alien, there is no presumptive period of time within which the alien's removal must be accomplished, but the prospects for the timeliness of removal must be reasonable under the circumstances."[13]

46.     The Detention and Deportation Officer's Field Manual states that "the longer an alien remains in [ICE] custody after being ordered removed, the higher the burden on the

---

[12] 8 C.F.R. § 241.4(k)(2)(iii) (2005).

[13] 8 C.F.R. § 241.13(f) (2005).

government to establish that the alien's removal is going to occur in the reasonably foreseeable future."

47. If HQPDU issues a continue in detention decision at the first review after 180 days, the Deportation Officer at the Chicago Field Office "will continue appropriate follow up efforts to remove the alien." If the alien is not removed within a reasonable time, "the local field office is to inform HQPDU by way of a memorandum (which is also to include any updates to the POCR package) so that a new custody decision under 8 CFR 241.13 may be made." The field officer is responsible for the review of the alien's file, and "each case officer is to review every long-term final order case and update DACS at the minimum every 30 days." In June 2003, Immigration and Customs Enforcement issued a policy statement entitled, "Endgame, Office of Detention and Removal Strategic Plan, 2003-2012."[14]

48. The Chicago Field Office and HQPDU have the Endgame Strategic Plan and know its contents, including its goal of 100% removal of all removable aliens.

49. The Endgame Strategic Plan contains the following ICE policy statements:

> "Throughout the next ten years, DRO will implement and execute a series of strategies that will develop the capacity and capability to execute all final orders of removal."

> "Over the next ten years, *Endgame* will lay the groundwork for developing the capacity and capability to remove all removable aliens."

> "Removing all removable aliens is in fact, DRO's mission."

> "The 'endgame' of immigration law enforcement is the removal of individuals who have received final orders of removal. This is the essence of DRO's mission."

---

[14] PX 500.

"Key elements in exercising these responsibilities include . . . developing and maintaining a robust removal program with the capacity to remove all final order cases issued annually, thus precluding growth in the illegal alien absconder population."

"DRO will increase its overall number of removals annually in order to thwart and deter continued growth in illegal alien population."

"Moving toward a 100% rate of removal for all removable aliens is critical to allow the ICE to provide the level of immigration enforcement necessary to keep America secure."

"DRO Goal One – Removals"

"The key success factors are: Percent of removals related to final orders issued."

50. "Endgame" recognizes that releasing an alien who is under a final order of removal substantially reduces the probability of ever removing that alien: "The Detention and Removal Program does not have a program to effectively manage its non-detained docket. The appearance rate of individuals released from ICE custody is estimated to be 15 percent and the program does not have the resources to identify, locate, apprehend and process the remaining 85%." The Chicago Field Office Director agreed with this statement.

51. "Endgame" also recognizes that institutional issues degrade ICE's ability to achieve its stated goal of removing 100% of all removable aliens:

". . . the [DRO] program does not have reliable modes to determine what the true workload-to-personnel ratio should be."

"The current field structure, coupled with a lack of unified national operations, plans, has resulted in diversified and inconsistent interpretations of policy and guidance within and between regions and districts."

"The Deportable Alien Control system no longer responds to the demands placed on it in today's operational environment."

52. The General Accounting Office has reported the shortcomings of the DACS computer software system because of, among other things, its inability to automatically prompt a reminder of dates for the 90 day review, the 180 day review, or any subsequent review.[15] ICE has acknowledged this problem and has a new software system under development, but the date for the system's implementation remains uncertain. Accordingly, at this time each Deportation Officer maintains a personal "docket system" for when custody reviews must be made. In the Chicago Field Office, Deportation Officer Ahmad uses a system of colored "sticky notes" on files kept in separate piles in her office to remind her when reviews are due.

53. All ICE witnesses agreed they were not provided any additional guidelines for determining the meaning or application of "reasonably foreseeable future."

54. The Supervisor of HQPDU considered "significant likelihood of removal in the reasonably foreseeable future" to mean "feasibility" of removal in the reasonably foreseeable future.

55. At HQPDU, the Deportation Officers do not follow a standard system for keeping track of "180 day plus" cases.

56. The regulations contemplate that aliens might make efforts to assist in the removal process. ICE takes a "pro-active" position and does things "on behalf" of the alien, because ICE does not rely on the alien, at least partly because aliens may have no true incentive to assist beyond their legal obligation to do so.

57. HQPDU does not currently inform the alien that a "180 day plus" review is about to take place, though HQPDU used to do so.

---

[15] *Id.* at p. 3, 12.

## Further Findings of Fact and Opinion

In this case, injunctive relief is sought on the grounds that ICE unlawfully delays reviews of the likelihood of repatriation and prevents detainees from supplying information which might show that repatriation is unlikely and, by so showing, secure release from custody.[16]

The class argument in favor of relief is based on the state of mind of those who administer the detention process and on the leeway that the applicable regulations give them. The Supreme Court did not itself define what might be the "reasonably foreseeable future," except to say that the longer one is in custody, the shorter the period of reasonably foreseeability ought to be. Different officials give their definitions in non-uniform language, e.g., (a) no significant likelihood means removal is not going to happen; (b) significant likelihood means removal is imminent; (c) significant likelihood is dependent on the facts of each case rather than upon a set standard.

The policies of ICE itself encourage continued detention by setting a goal of 100% removal of all removable aliens. ICE regards itself, in part, as a law enforcement agency that rounds up wrongdoers. It displays its bias with a checklist that instructs deportation officers how

---

[16] This is not an instance in which the Supreme Court announced a change in operating rules for government agencies that caused the government to scramble to change its procedures and find the resources to execute them. The seminal case, decided on statutory construction grounds, was *Zadvydas v. Davis*, 533 U.S. 678 (2001). The *Zadvydas* Court found limits on the government's power to keep aliens under final orders of removal in custody. The Court said that, implicit in the statute, was a limit of 180 days of custody unless the government could show there was "a significant likelihood of removal within the reasonably foreseeable future." *Id.* at 701. In *Clark v. Martinez,* 543 U.S. 371, 378 (2005), the time limit was found to be applicable to aliens detained at the border as well as those who, like *Zadvydas,* had entered the country and only later became subject to removal. Enough time has passed for the government to comply with these statutory provisions. The government does not argue that it needs time to do so. It asserts that it is acting in compliance with the statutes as construed by the Court.

to find that removal is likely. And if removal is found likely (which means continued detention), the regulations require only an annual review and the alien can request a review only once every six months. The timing of this practice results in many aliens (even those who, like the majority, are ultimately released) remaining in custody for more than the half-year that the Supreme Court allows.

Apart from the ICE's policies, its procedures fail to inform the aliens about how they might help their own cause. Aliens are not asked to give reasons why their chances of removal are unlikely. Aliens are not told what evidence the ICE will rely on in deciding whether to keep them locked up. Aliens are not told that the law requires ICE to offer evidence to rebut any good reason the alien happens to give for believing there is no reasonable likelihood of removal.

Nevertheless, none of these reasons, on their face, mandates a decision in favor of the class. The vague nature of the standard is the product of the Court's language, which has never been clarified. The standard, however, is no more vague than many used in the law. It is true that the consequences of an erroneous decision are serious, but the law allows courts to imprison people for long periods based on randomly selected jurors' understanding of "reasonable doubt."

Administrative agencies often give detailed regulatory content to phrases in legislation and rulings; "reasonable likelihood" is no more amenable to detailed content than is reasonable doubt. So rulings will be inconsistent as verdicts are inconsistent and it is permissible to rely, in situations like these, upon the expertise of those charged with securing removal. There was testimony that, as time went on, deportation officers did acquire knowledge about which nations would repatriate which aliens, which would not, and about building relationships with consular officials of those nations in order to facilitate removal. None of this is surprising since the

*Zadvydas* Court itself declined to give any guidance on "reasonable likelihood" or "reasonably foreseeable." Writing for the Court, Justice Breyer said:

> Ordinary principles of judicial review . . . recognize Executive Branch primacy in foreign policy matters. And they consequently require courts to listen with care when the Government's foreign policy judgments, including, for example the status of repatriation negotiations, are at issue, and to give the Government appropriate leeway when its judgments rest upon foreign policy expertise.

*Zadvydas*, 553 U.S. at 700.

Nor is it damning that ICE sees itself as a law enforcement agency. Many of the aliens are subject to removal because they have been convicted of crimes and all are in this country without legal right. It is not discrediting for an agency to seek to remove 100% of those who are under final order of removal. In reality, 100% success is unattainable. That said, one would question the wisdom of an agency administrator who set a goal of 90% and implicitly adopted a policy that the agency did not care that 10% of the orders of removal go unenforced.

ICE's failure to seek the aliens' deeper involvement in the process of securing removal, that is to say, persuading the native nation to take the alien back, is not necessarily significant. It is clear from the evidence that removal is achieved when a reluctant nation is persuaded to take the alien back. This process is one which involves negotiation between deportation officers and consular officials against a backdrop of several or many cases over the years. The alien usually contributes information about family and status within the nation to which he is to be removed. In that process, the alien is not only asked to cooperate, he is required by law to do so. The law requires this because, in some case, the alien has no desire to return. Indeed, there was no showing of what kind of assistance the alien could offer. It is reasonable to assume that some information that would show unlikelihood of removal might be personally damning to the alien

and not eagerly offered. Also, some information might properly be raised in an asylum proceeding.

So none of the arguments are compelling. This does not mean they are without weight. The 100% removal goal is not facially inappropriate but quotas do tend to cause government employees to be slanted or bias judgments to please their superiors, particularly where, as here, these officers have heavy caseloads. The vagueness of "reasonable likelihood" gives them leeway to do so. While most aliens have little chance of contributing something useful to the process of removal, it does not follow that none or almost none of them do. In the end, the decision here must be made on the evidence of what is actually done in the Chicago District Office and on my judgment of the credibility of the witnesses I heard and the reasonableness of their testimony in light of the circumstances before me.

At the outset, I reject the argument that the announced 100% removal policy creates a big incentive to detain. Over 70% of class member detainees are released. This large a number suggests that the 100% goal is traditional chest-thumping by government agencies that does not affect decisions made in the field. Moreover, I heard the testimony of some of the decision-makers, and I do not believe that any of them felt compelled to extend detainment in order to make some kind of showing that ICE was serious about meeting the aspirational and impossible 100% goal.[17]

The government concedes, as it must, that while some individual cases will be badly handled, the process is not itself in need of change mandated by court order. It is, in large part,

---

[17] The step-by-step checklist is apparently new to the deportation officers here and its use was not proven. Its provenance is unclear.

the practices of the Chicago District Office that are at issue here. Determinations about the likelihood of removal are the province of a small number of deportation officers who do nothing but that work, most of which consists of trying to get travel documents from foreign governments. The practice in Chicago is to make an initial determination (required by regulation) and to conduct a second review of the case (which is not required by regulation) a few days before the 180 day deadline. The Field Operations Director, Deborah Achim, may conclude that there is no significant likelihood of repatriation within the reasonably foreseeable future and order the release of the alien, subject to exceptions for aliens who are flight risks or a danger to the community. If she reaches the opposite conclusion, the matter transfers to ICE headquarters which does a second, formal, post-order custody review. The deportation officers learn which countries are most reluctant to accept their citizens back and the ways in which this reluctance can be overcome by calling on specific consular personnel and using accumulated data about the approaches that might work with a particular foreign nation.

There are not all that many deportation officers who do this work. There is some room for individual practices. One officer used both a computer and post-it notes to keep track of the cases on her docket. A supervisor checks his database every day, and if a deadline has passed without action, he reminds the officer. Such reminders are not generally required. A large number of detained aliens, who come into the system at the rate of about 800 a month, are, in fact, routinely removed without difficulty. The routine is to release those unlikely to be removed within 90 days (the government is permitted a minimum of 90 days for its process). By the time the 180 day period has passed there are relatively few aliens left in detention. At the time of trial, the number of detained aliens, whose cases have been sent to headquarters after 180 days, were in the low single digits.

One focus of any case governed by *Zadvydas* is what happens after 180 days. These are the cases that are transferred from Chicago to headquarters. It appears that Chicago does not now retain (by design or accident) any of these cases past 180 days. The second review at headquarters is performed by a small staff of three or four officers and a supervisor who endeavors to complete it within 14 days and no more than thirty days. In effect, this extends the 180 limit by several days but nobody makes anything of this here.[18] The supervisor opined that the routine cases are easy and promptly decided. It is the cases in which even long-term detention is permitted that take time, e.g., persons detained as dangers to the community. Headquarters also reviews the District Offices and it has found the Chicago office to have no deficiencies. More importantly, only twelve aliens had been detained for more than 180 days in 2005. In the month before trial, the number was nine, but only three of them could fall within the class defined in this case.

This is not to say that no aliens were detained beyond when they should have been released. No doubt some were, but this demonstrates only that a wrong decision was made. To draw an appropriate—if sometimes uncomfortable—comparison, there is no evidence of an error rate by ICE that exceeds the error rate of American trial judges as calculated by appellate reversals. Indeed, there was no attempt to prove that any decision with respect to a particular class member was wrong. Nor was there proof that timely hearings were not held.

---

[18] Some flexibility is inevitable because removal is dependent on the conduct of foreign nations whose actions are outside our government's control. An Embassy that says that it will deliver travel documents or will give an answer in thirty days properly causes ICE to wait to see if that occurs, even if the thirty days is tacked on to the end of the 180 day period. The foreign nation may not keep its promised deadline but our government still holds out hope for travel papers in the future.

What the petitioners have is statistics showing that the mean number of days in detention of some 68 detainees is about 282 and the median is 263. This is a lot longer than intuition would lead one to expect but intuition is often unreliable. The limit of 180 days is a guideline and it is possible that ICE honestly, but mistakenly, believed that removal was likely under *Zadvydas*. Then there are those, who for valid reasons, do not have to be released from detention for many months. The list of 68 includes aliens from countries that do not resist repatriation; it is fair to infer that these aliens are not the victims of ICE processing. Detention is expensive and the government has no interest in extending it by keeping aliens whose native lands are usually willing to accept them back.

I find that ICE makes a reasonable and appropriate effort to comply with *Zadvydas*. I find this effort is what is required by law. For mistakes and failures, which will inevitably occur in a certain number of cases, the law provides an adequate remedy by use of a petition for a writ of habeas corpus.

The aliens subject to detention could be given more written information—in formal notices—about how to prove that removal is not a significant likelihood in the reasonably foreseeable future. The question in this case is whether the alien is given enough information so that the alien has a meaningful opportunity to be heard on the question of his or her repatriation. There is a practice of deportation officers to visit detention sites and make themselves available to detainees who have questions. A private organization prepares a "know your rights" packet that is available to all detainees and which describes the kind of paperwork that would help the alien get out of jail. One deportation officer testified, credibly, that she is frequently contacted by

detainees who have questions (which she answers) and who offer information which she documents in her file. This is in addition to communications from attorneys for the aliens.

There was no instance presented to me in which an alien testified that he or she did not know what could be done to assist his or her cause and that this ignorance led to excessive detention. Persons in custody have an obvious incentive to offer every bit of information that they think will help gain their freedom. In light of this incentive, it is difficult to believe that any significant number of unrepresented detained aliens capable of assisting their cause would be, in the circumstances of this case, at a loss to know what to submit to help themselves. I would infer that aliens' filings would be much like the kitchen sink habeas corpus petitions which state prisoners file in our courts. There was no evidence offered to show that any particular alien did not know what could be done to help and, for this reason, was harmed by an overlong detention.

Finally, it is not disputed that ICE, not alone among federal agencies, has a computer system that could be better both at flagging the need for post-order custody reviews and monitoring the process. But this is not shown to have a real world effect on the members of this class. Computer support makes it easier to track and comply with deadlines and schedules, but it is not necessary to achieve that end. Lawyers have done a decent job of this for years before the computer age; if post-it notes work, and they seem to, then the flawed computer system imposes unnecessary burdens on government workers to do as the law requires. It is not proven that these workers fail in their mission simply because the computer system is not as good as it ought to be.

Injunctions requiring changes in rules and procedures of the government agencies as well as their practices are not common. Indeed they are not common even in civil cases because of justified concern over the ability of judges to make management decisions, the cost of oversight and the appropriateness of their doing so even when competent. *See Graham v. Medical Mut. of*

*Ohio*, 130 F.3d 293 (7th Cir. 1997); *Original Great American Chocolate Chip Cookie Co. v. River Valley Cookies*, 970 F.2d 273 (7th Cir. 1992). This is particularly true when no specific wrongful injury has been shown to occur to specific persons as a result of the conduct challenged, even if one assumes there are class members with standing to complain. Proof that government processes could be improved, even substantially improved, does not make the case for relief here. The requirements of due process have been met here and that is all that is required. *Landon v. Plasencia*, 459 U.S. 21, 34-45 (1982)

## Conclusion of Law

1.      The Court has jurisdiction over the parties and the subject matter.

2.      Neither the class nor any of its individual members are entitled to injunctive relief against the respondent.


ENTER:

*James B. Zagel*

James B. Zagel
United States District Judge

DATE: February 27, 2007